(No. 79309.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT CLOUTIER, Appellant.

*Opinion filed September 18, 1997.—Rehearing denied December 1, 1997.*

142

146

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield,

and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Margaret J. Faustmann, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Robert Cloutier, was found guilty of the first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)) and aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(4)) of Alice Cogler on January 28, 1990. Thereafter, a capital sentencing hearing was held before the jury, and defendant was sentenced to death. On appeal, this court affirmed defendant's convictions, but vacated his death sentence because the trial court improperly failed to "reverse-*Witherspoon*," or "life-qualify," the jurors in accordance with *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992). *People v. Cloutier*, 156 Ill. 2d 483 (1993). We remanded the cause for a new sentencing hearing. On remand, a bifurcated capital sentencing hearing was held before a jury, which determined that defendant was eligible for the death penalty and that there were no mitigating factors sufficient to preclude imposition of the death sentence. The trial court sentenced defendant to death in accordance with the jury's verdict, and this appeal followed.

## BACKGROUND

The factual background of the guilt phase in this case is set forth in our earlier opinion (*People v. Cloutier*, 156 Ill. 2d 483 (1993)) and will not be repeated in detail here. Defendant was arrested on February 1, 1990, after he was identified as the perpetrator of attacks on two women, Susan Bradford and Elizabeth Halili. Also, the victim in this case, Alice Cogler, had last been seen with

defendant, and defendant was suspected of involvement in the disappearance of a fourth woman, Cynthia Cooney. Following his arrest, defendant admitted to police that he had killed both Cogler and Cooney, and he disclosed where their bodies could be found. Defendant gave detailed statements about the killings in the presence of a court reporter, and the statements were read to the jury at the eligibility stage of defendant's sentencing hearing.

According to defendant's statement, he visited a tavern called the Huggery on the evening of January 27, 1990. At about 9 p.m. defendant left the tavern, accompanied by Alice Cogler. Defendant related that Cogler performed oral sex on him, and they later returned to the Huggery, where they remained until closing time. They then proceeded in Cogler's car to the vicinity of the Rose Meat Packing Company in Chicago, where they engaged in consensual vaginal and anal sex in the backseat of the car. After having sex, defendant and Cogler held each other for a few minutes. Defendant then began choking Cogler with his hands. After determining that Cogler still had a heartbeat, defendant wrapped a fan belt that he found in the car around Cogler's throat. Defendant squeezed the fan belt until Cogler's lips were blue and he could no longer detect a heartbeat. Defendant then covered the body with some clothing and left it on the backseat. Defendant eventually transferred the body to the trunk of the car, which he then abandoned.

Defendant told the authorities that he met Cynthia Cooney on the evening of January 29, 1990, at a tavern called Panama Sid's. They left together at 12:30 or 1 a.m. and drove in Cooney's car to Summit, Illinois, where they engaged in vaginal and oral sex. Defendant stated that he and Cooney then held each other for a while, and then defendant started to choke Cooney with

his hands. When defendant believed that Cooney was dead, he drove to Willow Springs, and disposed of Cooney's body in the Des Plaines River.

The State presented evidence that defendant had previously been found guilty by a jury of first degree murder and aggravated criminal sexual assault with respect to Cogler, and that defendant had pleaded guilty to the same charges in connection with Cooney's death. During the eligibility stage, the State also presented the testimony of Chicago police detective William Drish regarding conversations with Susan Bradford and Elizabeth Halili, who reported being attacked by defendant. Defendant objected that the proffered testimony was inadmissible hearsay, but the trial court overruled the objection.

According to Detective Drish's testimony, Susan Bradford recounted that on the morning of January 28, 1990, she met an individual with long blond hair named Bob at a lounge, and they later proceeded to a house where a group of people were gathered. Bob offered Bradford a ride home, and during the drive, he began to struggle with her. Bradford's clothes were torn and Bob grabbed her breasts. At one point, Bob grabbed Bradford by the hair and turned her head toward the backseat of the car, where she saw the body of a white female. Bradford was able to escape from the car, and after she started screaming, Bob drove away. The incident described by Bradford would have occurred about 2 1/2 hours after the time of Alice Cogler's murder.

Elizabeth Halili reported to Detective Drish that on the morning of January 28, she was working as a clerk at a gas station when she encountered a man with long blond hair worn in a ponytail. The man announced a robbery, and forced Halili into a brown Oldsmobile. (According to Detective Drish, Susan Bradford had provided

a similar description of the vehicle driven by her assailant.) After forcing Halili into the Oldsmobile, the man ordered her to remove her clothes, and also tore at parts of her clothing. Like Bradford, Halili told Detective Drish that her attacker grabbed her hair and turned her head toward the backseat, where she observed the body of a white female. Halili was able to escape from the vehicle, and her attacker drove off.

Based on this evidence, the jury unanimously determined that defendant was eligible for the death penalty for the murder of Alice Cogler based on two separate statutory aggravating factors: (1) the murder occurred during the course of another felony (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)); and (2) defendant had been convicted of murdering two or more individuals (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3)). Thereafter, the jury heard evidence of aggravating and mitigating factors. Susan Bradford and Elizabeth Halili testified in person regarding the attacks by defendant that Detective Drish had described during the eligibility stage. Another woman, Marie Goodman, testified that defendant attacked her during the same time frame. Goodman testified that she had made defendant's acquaintance in September 1989. About 7 a.m. on January 28, 1990, defendant arrived, uninvited, at Goodman's home, with visible scratch marks on his chin, neck and wrist. Defendant claimed he had been in a fight, and he departed from Goodman's apartment after a few minutes. Defendant returned at around 10:30 a.m. and took Goodman and her young son out for breakfast. After they returned from breakfast, defendant attacked Goodman. He placed his thumb at the base of her throat so that she was barely able to breathe. Defendant physically placed Goodman's hand on his penis and tore her shirt open. When Goodman's son came into the room, defendant left.

A number of witnesses for the State provided accounts of several robberies committed by defendant in 1983. Defendant targeted convenience stores, gas stations and liquor stores. In October 1983, while driving a stolen vehicle, defendant led Chicago police on a high-speed chase that ended when defendant collided with a police vehicle. It was stipulated that defendant entered the Department of Corrections in 1983 to serve four 12-year sentences for armed robbery and a three-year sentence for theft. All sentences were to be served concurrently. It was further stipulated that defendant was "paroled" in September 1989. (In fact, defendant was not paroled, but was released as a result of the accumulation of day-for-day good-conduct credits under section 3—6—3(a)(2) of the Unified Code of Corrections (730 ILCS 5/3—6—3(a)(2) (West 1994)).)

Springfield police officer Robert Crouch testified that on the morning of October 28, 1989, he observed defendant striking a woman in the head and face with a large chain. The woman told Officer Crouch that defendant was her boyfriend. He had become angry with her, dragged her down the street with the chain around her neck, and then began beating her with the chain. It was stipulated that defendant thereafter returned to prison because of a violation of the terms of his "parole," and was again released from custody in late December 1989. After his release, defendant engaged in an extensive spree of armed robberies in January 1990 before being arrested for the murders of Alice Cogler and Cynthia Cooney.

It was stipulated that during his incarceration from 1983 to 1989, defendant received a total of 52 disciplinary tickets from Department of Corrections personnel. Defendant also received five disciplinary tickets between August 1991 and January 1995 during his incarceration in the Department of Corrections following his convic-

tions for the murders of Alice Cogler and Cynthia Cooney. Timothy Pruett, a correctional officer, testified that on July 17, 1994, defendant threw a pitcher of scalding water at him at the Pontiac Correctional Center. Officer Pruett suffered minor burns to his neck and back.

As evidence in mitigation, defendant presented the testimony of Lawrence Heinrich, a clinical psychologist. Based on psychological testing, interviews with defendant and review of documents relating to defendant's criminal history and personal background, Dr. Heinrich concluded that defendant suffered from antisocial personality disorder and mixed substance abuse disorder. Defendant also showed some traits of narcissistic personality disorder. Antisocial personality disorder is characterized by defects in interpersonal relationships and a lack of conscience and social sensitivity, and is commonly associated with criminal or delinquent behavior. Mixed substance abuse disorder involves the abuse of a variety of drugs and alcohol in such a manner that the toxic effects of the substances tend to aggravate each other. Narcissistic personality disorder is characterized by self-centeredness, grandiosity in pleasure-seeking endeavors and a lack of empathy.

In connection with his evaluation, Dr. Heinrich reviewed a biographical sketch of defendant prepared by defendant's mother. The biography indicated that defendant was raised by his mother along with his four sisters. Defendant never fit in or felt connected with the rest of the family. Defendant's problems became worse when he suffered a serious eye injury as a child. He was abusing drugs and alcohol by the time he was in high school. During his teen years, defendant spent time in a youth home or detention center. At one point while defendant was in the facility, his family moved without telling him where they could be found.

Dr. Heinrich observed that a police bulletin issued in connection with efforts to arrest defendant identified him as a heavy user of cocaine and other drugs. Dr. Heinrich further noted that defendant had been ordered to participate in an alcohol abuse program as a condition of his supervised release from prison. Dr. Heinrich noted that persons suffering personality disorders often use drugs and alcohol for purposes of self-medication to soothe the unpleasant feelings associated with their disorders. Dr. Heinrich believed that drugs and alcohol influenced defendant's behavior and impaired his judgment during the series of fatal and nonfatal attacks on women on January 28 and January 29, 1990.

Alvin Hill, coordinator of the Cook County Public Defender's Sentencing Advocacy Program, also testified on defendant's behalf, elaborating on the biographical information supplied in written form by defendant's mother. Defendant's mother indicated that defendant's life changed drastically when he was 13 years of age: he no longer took pride in himself, started to cruelly tease his sisters, and substantially withdrew from family life. Defendant also experienced problems with truancy and stole money from the family. Defendant's mother noted that when the family moved while defendant was in the youth home, they left no forwarding address and changed their telephone number. According to defendant's mother, they "left no trace."

Hill also testified about conversations with defendant. Defendant expressed his love for and loyalty to his family, but maintained that his family did not understand him. Defendant was adamant that his family not be asked to testify on his behalf. Defendant related that he began using alcohol at about the age of 10 and street drugs at the age of 13. Defendant indicated that he was "drugging" at the time of the murder of Alice Cogler. Defendant expressed remorse for his crimes and the suf-

fering inflicted on the families of the victims and on his own family. Defendant had received a general equivalency degree while incarcerated, and felt that he could help younger inmates.

Having heard the foregoing evidence, the jury returned a verdict finding that there were no mitigating factors sufficient to preclude imposition of the death sentence.

## ANALYSIS

### I. Eligibility Stage

#### A. *Hearsay Evidence*

Defendant contends that the trial court erred at the eligibility stage of sentencing by allowing Detective Drish to testify about conversations with Susan Bradford and Elizabeth Halili in which they described how they were attacked by defendant. Defendant argues that the evidence was both irrelevant and inadmissible under the hearsay rule. In defendant's original appeal, we held that testimony by Bradford, Halili and other victims who survived attacks by defendant was admissible to establish that defendant's sexual conduct with Alice Cogler was achieved by the use of force. *Cloutier*, 156 Ill. 2d at 505-06. Similarly, Detective Drish's testimony was relevant at the eligibility stage of sentencing to establish the statutory aggravating factor that Cogler was murdered during the course of another felony: aggravated criminal sexual assault. We agree with defendant, however, that notwithstanding the relevance of the subject matter of Detective Drish's testimony, the testimony was inadmissible hearsay.

Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible unless it falls within a recognized exception. *People v. Lawler*, 142 Ill. 2d 548, 557 (1991). Without citation of authority, the State argues that

Detective Drish's account of conversations with Bradford and Halili was admissible under the state of mind exception to the hearsay rule. The State argues that the evidence shows that defendant displayed the victim's body to Bradford and Halili in an effort to force them to "submit to his wishes." This, according to the State, shows that in killing the victim defendant acted with the culpable mental state necessary under *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), before capital punishment may constitutionally be imposed. The State contends that the out-of-court statements were not offered to prove the truth of the matter asserted.

The State's argument is unpersuasive. Unless the out-of-court statements by Bradford and Halili were true, they could have no bearing on defendant's mental state. The State's effort to shed light on defendant's mental state necessarily depended on the truth of the matter asserted. The State misunderstands the state of mind exception to the hearsay rule. Under that exception, an out-of-court statement of a declarant is admissible when that statement tends to show the *declarant's* state of mind at the time of the utterance. *Lawler*, 142 Ill. 2d at 558. In order to be admissible, the *declarant's* state of mind must be relevant to a material issue in the case. *People v. Nyberg*, 275 Ill. App. 3d 570, 580 (1995). In this case, defendant was not the declarant: the declarants were Bradford and Halili. Their state of mind when they spoke with Detective Drish has no bearing on defendant's state of mind when he killed the victim. Because the State relies exclusively on the state of mind exception, we need not consider whether any other exceptions to the hearsay rule might apply to this case.

Although Detective Drish's testimony regarding out-of-court statements by Bradford and Halili was inadmis-

sible hearsay, the error in admitting this testimony does not require reversal of defendant's death sentence. Defendant argues that the evidence may have contributed to the jury's determination that defendant was eligible for the death penalty on the basis that he murdered Alice Cogler during the course of another felony: aggravated criminal sexual assault. Defendant notes that the victim showed no signs of vaginal trauma, and cocaine was detected in the victim's blood. According to defendant, this evidence is consistent with his account of the crime, in which he maintained that he engaged in consensual sex with the victim prior to the murder. Defendant argues that but for the improperly admitted evidence of his attacks on Bradford and Halili, the jury might have returned a verdict in his favor on the felony-murder aggravating factor.

Be that as it may, based on careful review of the record we conclude that the improperly admitted hearsay could have had no effect on the jury's separate verdict on the multiple-murder aggravating factor set forth in section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3)). In determining whether a defendant is eligible for the death penalty under section 9—1(b)(3), the sentencing jury must consider whether the defendant was convicted of murdering two or more individuals and whether the deaths were the result of either an intent to kill more than one person or of separate acts that the defendant knew would cause death or create a strong probability of death or great bodily harm to the victim. *People v. Hooper*, 172 Ill. 2d 64, 73 (1996). In the present case, overwhelming evidence was presented establishing defendant's eligibility for the death penalty under the multiple-murder factor. The State introduced certified copies of defendant's convictions for the murders of Alice Cogler and Cynthia Cooney, and defendant's own state-

ments detailing the deliberate manner in which he killed the two women establish that he acted with the requisite mental state under section 9—1(b)(3).

This court has held that the Illinois death penalty statute does not place special emphasis on any aggravating factor and does not accord added significance to multiple aggravating factors as opposed to a single factor. *People v. Brown*, 169 Ill. 2d 132, 164 (1996). Once one statutory aggravating factor has been found, the defendant is eligible for the death penalty, regardless of whether other factors have been proved as well. *Brown*, 169 Ill. 2d at 165. Thus, where a defendant is found eligible for the death penalty based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated will not generally impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility. *People v. Cole*, 172 Ill. 2d 85, 102-03 (1996); *People v. Bounds*, 171 Ill. 2d 1, 69 (1995); *Brown*, 169 Ill. 2d at 165; *People v. Page*, 156 Ill. 2d 258, 268 (1993), citing *Zant v. Stephens*, 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50 (1983); see also *People v. Todd*, 154 Ill. 2d 57, 75 (1992). In the case at bar, the jury's verdict on the multiple-murder factor independently established defendant's eligibility for the death penalty regardless of the validity of the verdict on the felony-murder factor. See *Todd*, 154 Ill. 2d at 75.

We further emphasize that the improper hearsay evidence did not taint the jury's ultimate determination, based on evidence in aggravation and mitigation, that defendant should be sentenced to death. See *Tuggle v. Netherland*, 516 U.S. 10, 15, 133 L. Ed. 2d 251, 256, 116 S. Ct. 283, 285 (1995) (although error under *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985), affected only one of two statutory aggravating circumstances making defendant eligible for the death

penalty, error may also have affected the jury's ultimate decision, based on all the evidence before it, to sentence defendant to death rather than life imprisonment). As indicated, Detective Drish's testimony regarding the attacks on Bradford and Halili should not have been admitted during the eligibility stage of the sentencing proceedings. However, the testimony could properly be considered by the jury for purposes of its determination whether there were any mitigating factors sufficient to preclude the imposition of the death penalty. Ordinary rules of evidence are relaxed at the aggravation/mitigation stage of sentencing. The only requirements for admissibility are that the evidence be reliable and relevant. *People v. Hudson*, 157 Ill. 2d 401, 449 (1993). This is so because in determining the appropriate sentence, the sentencing authority must possess the fullest information possible concerning the defendant's life, character, criminal record and circumstances of the particular offense. *Hudson*, 157 Ill. 2d at 450. Hearsay evidence of other crimes which did not result in prosecution or conviction is therefore admissible at the aggravation/mitigation stage if it meets the requirements of reliability and relevance. *Hudson*, 157 Ill. 2d at 450. Detective Drish's hearsay testimony regarding defendant's attacks against Bradford and Halili was relevant to the jury's sentencing decision, and it was reliable because it was corroborated by testimony of the victims themselves. Accordingly, the admission of Detective Drish's hearsay testimony during the eligibility stage of sentencing was harmless error.

## B. *Improper Closing Argument*

Defendant argues that he was denied a fair hearing on his eligibility for the death penalty because during closing argument the prosecution improperly suggested that additional evidence of defendant's eligibility existed which could not be introduced at the eligibility stage.

Defendant's argument is based on the following portion of the proceedings occurring near the end of the State's closing argument:

"MR. BYRNE [Assistant State's Attorney]: Many of you might be wondering, so what's next? Remember, here at the eligibility stage, we're only able to present a limited amount of evidence on the murders and the rape, not the entire case.

And remember your oaths, at this point. Follow the law. Read the instructions. It's crystal clear what happened here, and it's crystal clear what he's been convicted of and it's crystal clear he's eligible for the death penalty.

For those of you who have some lingering, unanswered questions in your mind as to certain facts, that's for a later time.

MS. PLACEK [defense attorney]: Objection.

MR. RICHARDS [defense attorney]: Objection.

THE COURT: Sustained. Proceed.

MR. BYRNE: At the next phase, ladies and gentlemen, in aggravation and mitigation, both sides will have an opportunity to present additional evidence.

MR. RICHARDS: Objection, not relevant.

THE COURT: Sustained. Proceed.

MR. BYRNE: Only after the second phase is concluded, the phase of aggravation and mitigation, will we return to you and ask you to decide on the sentence in this case.

For now, we ask you to follow your oaths, look at the evidence that we've presented. Look at the instructions of law. Return both verdicts of eligibility on both statutory aggravating factors. Thank you."

Contrary to defendant's argument, these remarks did not insinuate that evidence bearing on defendant's *eligibility* for the death penalty had been withheld. Instead, when the remarks are considered in their entirety, it is apparent that the prosecutor was simply reiterating that if the jurors found defendant eligible for the death penalty, their *ultimate decision whether to impose the death penalty* would not be based solely on the eligibility stage evidence: a broader range of evidence in aggravation and mitigation would be available

for their consideration. With respect to the eligibility stage decision, the prosecutor specifically advised the jurors to confine their deliberations to the evidence introduced at that stage of the proceedings: "For now, we ask you to follow your oaths, *look at the evidence that we've presented.*" (Emphasis added.) The jurors were also properly instructed by the trial court "to determine the facts *and to determine them only from the evidence.*" (Emphasis added.) Considering the prosecutor's remarks as a whole, together with the instruction from the court, we conclude that the remarks were not prejudicial.

## II. Aggravation/Mitigation Stage

### A. *Jury Misconduct*

During the course of the State's presentation of evidence in aggravation, the foreman of the jury delivered a note to the trial judge asking, "Can we have a list of the events in chronological order from the release of [defendant] from prison in [September] of 1989 to his capture on [February] 1, 1990 when we start deliberation?" Based on this note defendant surmises that, in defiance of instructions from the court, the jury improperly discussed the case before being instructed to begin its deliberations. Defendant argues that this misconduct deprived him of a fair sentencing hearing. We disagree.

For purposes of our analysis, the following cogent summary of general principles is instructive:

"As a rule, it is improper for jurors to discuss among themselves the case or any subject connected with the trial until all of the evidence has been presented and the case has been submitted to them after final instructions by the trial court. By permitting the jurors to discuss the case among themselves *** the trial court authorizes and encourages them to give premature consideration to the evidence presented—consideration unaided by the final instructions of the trial court as to the law to be applied to the facts in the case. Furthermore, it is human nature

that an individual, having expressed his or her views of the guilt or innocence of a defendant, would be inclined thereafter to give special attention to testimony which strengthened or confirmed the views already expressed to other jurors.

Even so, under certain circumstances discussions of evidence among jurors before the final submission of a criminal case have been deemed not to have been improper, or as not having resulted in prejudicial error where, for instance, a review of the jurors' responses to questions of the trial court indicated that the jurors' impartiality had not been affected by their discussions among themselves of certain exhibits prior to deliberations. Even assuming that discussion by jurors of a case during recesses in the proceedings constitutes juror misconduct, the test for reversibility is whether the misconduct has prejudiced the defendant to the extent that he has been denied a fair trial. The important question in this regard is not whether the jurors kept silent with each other about the case, but whether each juror kept an open mind until the case was submitted to them." 75B Am. Jur. 2d *Trial* § 1610, at 379-80 (1992).

While jurors should not discuss the facts of the case before being instructed to begin deliberations, there is nothing in the record to indicate that the jurors did so in the present case. Contrary to defendant's argument, the jury foreman's note does not imply that any discussion of the evidence or the facts of the case had taken place. It merely reflects a possible discussion of a tangential matter regarding the presentation of the State's case. Assuming such a discussion occurred among some or all of the jurors, it could have engendered no prejudice to defendant.

Defendant also contends that if the jurors did in fact disregard the judge's admonition not to discuss the case, they may also have ignored the judge's instructions as to the law applicable to their decision whether defendant should be sentenced to death. In support of this argument, defendant cites two cases—*People v. Jones,*

105 Ill. 2d 342 (1985), and *People v. Rogers*, 135 Ill. App. 3d 608 (1985)—where criminal convictions were reversed because during trial the jurors were exposed to prejudicial material not admitted into evidence. In *Jones* a mimeographed copy of a racist joke was found in the jury room, and in *Rogers* certain jurors were exposed to a newspaper article containing information about the defendant that the trial court had ruled inadmissible. In each case, the reviewing court commented that the jurors' failure to bring the misconduct to the court's attention might indicate a lack of appreciation for their responsibilities as jurors. *Jones*, 105 Ill. 2d at 352; *Rogers*, 135 Ill. App. 3d at 628. *Jones* and *Rogers* do not control the case at bar. Both those cases involved flagrant misconduct bearing directly on the fairness of the defendants' trials. Here, however, even if the jurors did in fact discuss the desirability of a chronological list of events, the discussion would be at most an innocuous technical violation of the judge's admonition to refrain from discussing the case. This provides no basis for concern that the jurors did not generally appreciate their responsibilities or that they failed to abide by their oaths to follow the law as instructed by the judge.

To the extent that the jury foreman's note might have been viewed as creating the specter of improper communications among the jurors, defendant should have raised the matter in the trial court, as was done in *People v. Gilyard*, 124 Ill. App. 2d 95 (1970). This would have enabled the trial court, in its discretion, to probe the nature of the jurors' discussions, if any, and the extent to which those discussions might have compromised the jury's ability to render a fair verdict based on the evidence. However, on the basis of the record as it stands, defendant's contention that the jurors engaged in a premature discussion of the facts of the case, or any other misconduct, is entirely speculative.

In this vein, defendant argues that his trial attorney's failure to move for a mistrial based on juror misconduct represents ineffective assistance of counsel. We disagree. Claims of ineffective assistance of counsel are evaluated in accordance with the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), which requires a showing of deficient performance by counsel and resultant prejudice. To establish deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Prejudice exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Defendant has failed to show either requirement.

As already stated, by itself the jury foreman's note evidences at most a nonprejudicial technical violation of the trial court's admonitions. Under these circumstances, the decision whether to seek the jury's discharge was properly a matter for counsel's exercise of professional judgment. Counsel was familiar with the composition of the jury, and was able to observe the jurors' reactions to the evidence and to defendant. Counsel was therefore in the best position to determine whether the danger of prejudice from premature discussion of the case outweighed the risk of empaneling a new jury which might be less favorably disposed to defendant. Counsel's failure to request a mistrial was not objectively unreasonable under the particular circumstances of this case. Moreover, defendant cannot show prejudice. The jury foreman's note was not, in itself, grounds for a mistrial, and there is no way to determine from the record whether further inquiry into communications among the jurors would have revealed any misconduct sufficiently serious to justify a mistrial.

## B. *Improper Closing Argument*

Defendant argues that a number of remarks by the prosecutor during closing argument at the aggravation/mitigation stage were improper and deprived him of a fair sentencing hearing. At the outset, we note that defendant failed to object to several of the challenged remarks during sentencing. The State maintains that these issues are therefore waived. See *People v. Enoch*, 122 Ill. 2d 176 (1988). Defendant responds that he was excused from objecting to these remarks because objections would have been futile. Defendant argues that by repeatedly overruling defense objections to prosecutorial remarks, the trial court demonstrated a disinclination to limiting closing argument, and the pursuit of futile objections by defendant would simply have antagonized the jury. Defendant cites no authority that one may dispense with contemporaneous objections and assert error on appeal merely because he or she has suffered adverse rulings on other unrelated objections. Contemporaneous objections will often enable the trial court to cure error, thereby avoiding the possible need to retry the defendant. Obviously, the requirement of a contemporaneous objection promotes judicial economy and the swift and fair administration of justice. We are hesitant to undermine these objectives by allowing a criminal defendant to base his choice whether to object not on the merits of the objection but on a general appraisal of the trial court's inclinations. Hence we agree with the State that these claims of error are waived.

An exception to the waiver rule permits review of plain error. 134 Ill. 2d R. 615. However, this exception does not operate as a general savings clause: it may be invoked only when the evidence is closely balanced or the alleged error is so serious that it deprived the defendant of a fair trial. *People v. Childress*, 158 Ill. 2d 275, 300 (1994). Although the evidence in mitigation presented by the defense was not insubstantial, overall the

evidence at sentencing cannot be regarded as closely balanced. Thus, in considering claims of error involving comments to which defendant failed to object, our review is limited to consideration of whether the comments, if improper, were so prejudicial as to deprive defendant of a fair sentencing hearing.

Defendant first argues that the prosecutor misstated the law by arguing that defendant "signed his own death verdict" or "chose the death sentence" by killing Alice Cogler and Cynthia Cooney. Because defendant failed to object to these remarks, our review is confined to the question of whether the allegedly improper remarks were so prejudicial as to deprive defendant of a fair trial. According to defendant, the prosecutor's statements implied that the death penalty was mandatory in the case of multiple murders. We interpret the remarks differently. The prosecution's argument was designed to convey, albeit with rhetorical flourish, that defendant was responsible for the acts for which he was to be punished. The jury was properly instructed that in reaching its verdict, it was to determine whether there were any mitigating factors sufficient to preclude imposition of a death sentence, and the prosecution's remarks could not have misled or confused the jury about the basis for its decision. The challenged remarks do not constitute plain error on this basis.

Defendant alternatively argues that the prosecution's remarks improperly diminished the jury's sense of responsibility for imposing the death penalty, violating the principles of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985). In *Caldwell*, the prosecutor emphasized to the jury that if it should decide to impose the death penalty, its decision would be subject to review by the state supreme court. The *Caldwell* Court held that "it is constitutionally impermissible to rest a death sentence on a determina-

tion made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639. However, in several cases involving remarks similar to those in the case at bar, this court has concluded that the jury would have understood the remarks not as literal statements of the law but as comments on the evidence. See *People v. Burgess*, 176 Ill. 2d 289, 318-20 (1997); *People v. Cole*, 172 Ill. 2d 85, 112-13 (1996); *People v. Page*, 155 Ill. 2d 232, 280-82 (1993); *People v. Kokoraleis*, 132 Ill. 2d 235, 286 (1989); see also *People v. Moore*, 171 Ill. 2d 74, 120-21 (1996) (prosecutor's remark that defendant "sentenced himself to death" may have been interpreted as merely emphasizing the strength of the aggravating evidence). The same conclusion emerges in this case. The prosecutor's comment that defendant "chose" the death penalty simply expressed the idea that defendant deserved the death penalty for the acts of violence he chose to commit. Unlike the remarks in *Caldwell*, the prosecutor's rhetorical comments in this case could not have affected the jury's understanding of its role as sentencer or the gravity of its sentencing decision. See *People v. Pasch*, 152 Ill. 2d 133, 205-06 (1992) (remark that defendant was responsible for the sentence received did not shift the responsibility of death from the jury to another judicial body, and defendant's attempt to equate himself with another judicial body was unfounded).

Defendant cites *Buttrum v. Black*, 721 F. Supp. 1268 (N.D. Ga. 1989), *aff'd*, 908 F.2d 695 (11th Cir. 1990), in support of his argument that the prosecutor's statements ascribing the sentencing decision to defendant violated *Caldwell*. In *Buttrum*, a *Caldwell* violation was found where the prosecutor argued that the defendant had signed her own death warrant and that the jurors

were merely a "cog" in the criminal justice process. As stated before, the remarks in the case at bar are properly viewed as a comment on the strength of the evidence against defendant; they did not trivialize the jury's sentencing function as did the comments in *Buttrum*. See *Page*, 155 Ill. 2d at 281-82. Therefore, *Buttrum* is inapposite.

Defendant also complains that the prosecution improperly urged the jury to impose the death penalty because the criminal justice system had treated defendant too leniently in the past. During closing argument the prosecutor stated:

> "Well, think about the lack of remorse here. Think about how it was that *** two weeks after he was reparoled he is out robbing and raping and murdering. That is remorse. I am sorry. Think about his earlier parole from the Illinois Department of Corrections when he had to be returned for beating his girlfriend. Think of that when you think of remorse. I am sorry. *He has had all kinds of breaks from the criminal justice system. Don't give him another.*" (Emphasis added.)

During rebuttal, the prosecution argued, "You could rob, and you can rob, and you can rob with a gun and you can steal a car and you can get a 12 year sentence and you get out in six years, and you come out and you beat a woman in the face with a chain *** [a]nd *** the criminal justice system will take you back for a month or two and then what you can do is come out again." Again, defendant failed to object to the remarks.

Although the parties stipulated that defendant had been "paroled" in 1989, after serving 6 years of four concurrent 12-year sentences for armed robbery, defendant points out that he was actually released as a result of day-for-day good-conduct credits under section 3—6—3(a)(2) of the Unified Code of Corrections (730 ILCS 5/3—6—3(a)(2) (West 1994)). Defendant argues that unlike parole, which signifies a discretionary release, *all* inmates (except those serving natural life sentences)

automatically receive a day-for-day credit against their sentence. Defendant thus takes issue with the prosecution's assertion that he received special treatment or "breaks" from the criminal justice system. Defendant also argues that the prosecutor's remarks impugned the criminal justice system in a manner condemned by this court in *People v. Williams*, 161 Ill. 2d 1 (1994).

We agree with defendant that the State mischaracterized the facts with its references to defendant being "paroled" and getting "breaks" from the criminal justice system. We also disapprove of any suggestion in the State's argument that defendant should be punished more severely now to compensate for overly lenient treatment in the past. Such argument is inconsistent with the principle that the focus in death penalty hearings must be on the particular nature of and circumstances surrounding the offense, and the individual character and record of the defendant. *People v. Szabo*, 94 Ill. 2d 327, 366 (1983). Nonetheless, the prosecution's remarks do not constitute plain error.

The thrust of the remark regarding parole was that defendant exhibited a brazen disregard of the law, as was evident in the commission of violent crimes shortly after his release from prison. In this context the distinction between release resulting from the accumulation of good-conduct credits as opposed to release on parole is unimportant, and the mischaracterization could not have affected the jury's sentencing decision. Defendant also contends that by mischaracterizing his release as a "parole," the State bolstered its argument that defendant received "all kinds of breaks from the criminal justice system." However, this was merely an isolated remark: it was not a major theme in the State's argument which mainly focused on defendant's background, and the circumstances of the murder of Alice Cogler and defendant's other crimes in late January 1990. Any

error arising from this remark was unquestionably harmless. With respect to the portion of the State's rebuttal argument quoted above, we do not approve of the disdainful attitude toward the corrections process evident in this passage. Again, however, these remarks were not dwelt upon at length and cannot be said to have deprived defendant of a fair sentencing hearing.

The brief comments in this case contrast sharply with the improper remarks in *Williams*, which "constituted almost the entirety of the State's rebuttal argument" such that "it [could not] be said that any improper remarks were merely isolated comments made in the course of a lengthy and otherwise proper argument." *Williams*, 161 Ill. 2d at 78. Additionally, in our estimation the objectionable remarks in *Williams* were substantially more inflammatory than the comments here. In *Williams*, the prosecutor criticized a plea agreement in a prior homicide committed by the defendant. Under the agreement, the defendant in *Williams* had pleaded guilty to voluntary manslaughter and received a 10-year prison sentence. However, the prosecutor argued to the jury that the defendant was actually guilty of murder in the prior homicide and should have been sentenced to 120 years' imprisonment.

In a related argument, defendant claims that his attorney's inaccurate stipulation that defendant had been "paroled" represents ineffective assistance of counsel insofar as the stipulation facilitated the State's erroneous argument. As discussed earlier a criminal defendant asserting ineffective assistance of counsel must show prejudice, which exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Since we have already concluded that the prosecution's mischaracterization of the basis for defendant's release could not have affected the jury's sentencing decision, defendant cannot establish prejudice.

Defendant also complains that the prosecution improperly commented on the "death qualification" of the jurors pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and its progeny. Once again, defendant failed to object to these remarks. At the outset of his rebuttal argument, the prosecutor reminded the jurors that during jury selection they had indicated that they were able to consider imposing the death penalty, whereas those prospective jurors who could not do so walked out of the courtroom without ever learning of defendant's "depravity." Defendant contends that these remarks implied that even the jurors excluded under *Witherspoon* because of their views about capital punishment might have voted for the death penalty had they heard the evidence in aggravation presented in this case. Defendant also claims that the prosecutor patronized the jurors "by telling them that they were predisposed toward death even without having heard about [defendant's] 'depravity.'" We disagree. Simply stated, defendant is trying to put words in the prosecutor's mouth. The ability or willingness simply to *consider* imposing the death penalty cannot fairly be equated with a "predisposition" toward death. Moreover, notwithstanding the prosecutor's passing reference to the excluded venire members, we find no reasonable basis for concern that the jurors based their verdict on anything other than their independent appraisal of the evidence presented in aggravation and mitigation.

We next consider those prosecutorial remarks to which defendant properly objected at sentencing. Defendant argues that the prosecutor misstated the law by arguing that the jurors could uphold the law and abide by their oaths only by imposing the death penalty. Specifically, the prosecutor told the jurors, "With your verdicts of death, you uphold the law. It's what you are

sworn to do." According to defendant these remarks were erroneous as a matter of law because "Illinois law permits an alternative to the death penalty in the case of an individual shown to have committed more than one murder—natural life in prison without possibility of parole." Defendant's contention is meritless. The challenged remark, which appears near the end of the prosecutor's closing argument, was a permissible comment on the strength of the evidence in aggravation as compared to the evidence in mitigation and properly emphasized the jury's duty to follow the law. See *People v. Pasch*, 152 Ill. 2d 133, 208 (1992). We find no error.

Finally, defendant contends that the prosecution improperly appealed to the jurors' emotions with arguments speculating that the victims and their friends and families would want defendant sentenced to death. During closing argument, the prosecutor stated that "what is at stake here is nothing short of human justice *** because from their graves there are two women who cry out for human justice. And in this whole world of ours there are only 12 people that could hear them and answer their cries, and that's the 12 of you." During rebuttal, the prosecutor responded as follows to the defense's argument that a sentence of natural life imprisonment was an appropriately severe punishment:

> "[Defense counsel] said natural life isn't a picnic. It isn't a pass. It's punishment. Would the friends and family of Alice Cogler and Cynthia Cooney gladly ask that he suffer that terrible punishment rather than the one he gave them? What do you think?"

Defendant contends that these appeals to emotion diverted the jury's attention from its task of evaluating aggravating and mitigating factors. Defendant also argues that the comments were unsupported by the evidence and that, in any event, such opinions regarding whether the death penalty should be imposed are irrelevant and therefore inadmissible. Proper or not, the

prosecution's argument concerning the victims and their families was not so inflammatory as to constitute reversible error. *Cf. People v. Spreitzer*, 123 Ill. 2d 1, 36-37 (1988) (prosecutor's rhetorical question to jurors regarding what the victims' families would think about sparing the defendant's life and sending him back to prison—which defendant viewed as a "country club"—was not grounds for reversal of defendant's death sentence).

## C. *Prejudicial Exhibit*

During the aggravation/mitigation stage the prosecution used an exhibit to visually depict defendant's criminal history. The exhibit consisted of a map of the southwest Chicago area bearing tags marking the location of the crimes described by the State's witnesses. The tags were placed on the map during the hearing by the State's witnesses as they gave their testimony. Defendant did not object to the State's use of the exhibit in connection with the examination of witnesses or to its admission into evidence. Defendant objected only to allowing the exhibit to go to the jury during its deliberations, but the trial court overruled this objection.

Defendant argues that this exhibit was improperly admitted into evidence, but because defendant failed to object to its admission the issue is waived unless the plain error rule applies. Defendant argues that the map was improper under *People v. Williams*, 161 Ill. 2d 1 (1994), which held that a similar exhibit was inadmissible because it merely summarized clearly understandable testimony and it unfairly memorialized the State's evidence in aggravation. Assuming for the sake of argument that the State's use of the map in the case at bar was improper, the error was not of sufficient magnitude to deprive defendant of a fair trial. The exhibit was neither inaccurate nor misleading, it does not appear to have been used in an inflammatory manner, and undoubtedly its impact on the jury was far less signifi-

cant than the testimony it summarized. Although defendant objected to sending the exhibit to the jury during deliberations, we find no error in this regard. Whether evidentiary items should be taken to the jury room is a matter for the discretion of the trial court, whose decision will not be disturbed absent an abuse of discretion to the prejudice of the defendant. *People v. Williams*, 97 Ill. 2d 252, 292 (1983). No abuse of discretion occurred here. The exhibit was admitted into evidence without objection, was accurate, was unlikely to inflame the jury, and was responsive to a request by the jury for chronological information about defendant's criminal history. Defendant also contends that his attorneys' failure to object to the exhibit represents ineffective assistance of counsel. We disagree. As previously discussed, a criminal defendant asserting ineffective assistance of counsel must show prejudice, which exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Given all the evidence in this case, no reasonable probability exists that the jury would have returned a different verdict but for this particular exhibit.

III. Constitutionality of the Death Penalty Statute

Defendant argues that various aspects of the death penalty statute and the applicable jury instructions create an unconstitutional risk of arbitrary or capricious imposition of death sentences in violation of the eighth and fourteenth amendments to the United States Constitution. Defendant contends that the procedures for imposing the death penalty are invalid because the prosecution exercises discretion in deciding whether to seek the death penalty; pretrial notice that the death penalty will be sought and pretrial notice of the aggravating factors on which the prosecution intends to rely is not required; this court undertakes only limited comparative proportionality review of death sentences; the

burden of proof is not placed on the prosecution; the sentencer may place the burden of proof on the defendant; the sentencer is not required to make written findings; and the sentencer is not permitted to consider the range of possible sentences that will be imposed if the defendant is not sentenced to death. This court has previously rejected each of these constitutional challenges, and has also rejected the argument that in combination these features violate the Constitution. See *People v. Burgess*, 176 Ill. 2d 289, 322-23 (1997) (and cases cited); *People v. Munson*, 171 Ill. 2d 158, 205-06 (1996). Defendant offers no persuasive reason why this court should reexamine its holdings on these issues.

Defendant also contends that the death penalty statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigating factors. Again, we have rejected the very same argument in prior cases (see *Burgess*, 176 Ill. 2d at 322; *Munson*, 171 Ill. 2d at 204-05), and there is no reason to revisit the issue in this case.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Thursday, January 15, 1998, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*