# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:1em;">

### *People v. Miller*, 2021 IL App (1st) 190060

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RODNEY MILLER, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-19-0060 |
| Filed | September 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-61233; the Hon. Brian Flaherty, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak, Retha Stotts, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Martin concurred in the judgment and opinion. |

¶ 1 Following defendant Rodney Miller's first trial in this matter,[1] he was convicted and sentenced to 19 years with the Illinois Department of Corrections (IDOC) for the aggravated possession of a stolen motor vehicle that was inoperable and left parked on the streets of Chicago. At defendant's first trial, the vehicle owner's husband testified that defendant operated a towing and repair service and that the husband sold the 14-year-old inoperable vehicle as scrap for $40 to Everett Myrick, who worked with defendant. Due to cumulative errors at trial and the closely balanced evidence, this court reversed defendant's conviction on appeal and remanded the matter for a new trial. *People v. Miller*, 2013 IL App (1st) 110879, ¶ 2.

¶ 2 On remand, defendant was convicted after a jury trial of aggravated possession of a stolen vehicle and sentenced to 15 years with IDOC. At the second trial, the husband testified that he had lied under oath at the first trial when he had previously testified that he sold the vehicle as junk without telling his wife, the vehicle's registered owner. Myrick testified, substantially as he had at the first trial, that he purchased the vehicle from the husband as junk before turning it over to defendant.

¶ 3 On appeal from his second trial, defendant raises one claim: that the trial court deprived him of his right to present a complete defense when the trial court refused his tendered jury instructions regarding mistake of fact. Defendant argues that the record contained evidence to support a reasonable belief that Myrick had lawfully purchased the vehicle from the husband. The trial court denied the instruction on the ground that any mistake of fact was Myrick's mistake and not defendant's mistake.

¶ 4 Where the record contains some evidence that defendant made a mistake of fact in relying on Myrick's legitimate purchase of the vehicle from the owner's husband, where some evidence is all the law requires before giving the instruction, where defendant's knowledge of the vehicle's status as stolen was the principal issue at trial, and where the husband must have committed perjury at one trial or the other, since his testimony at one trial completely contradicted his testimony at the other, we must again reverse and remand for a new trial.

¶ 5                                    BACKGROUND

¶ 6 At the second trial, which is the subject of this appeal, the defense argued in its opening:

"Ladies and gentlemen, there are only two issues in this case. First, the State must prove to you that the car was stolen. Second, the State must prove that [defendant] knew it was stolen ***."

¶ 7 The State's first witness, Sabrina Wright, testified that she lived with her husband, Ronald Abrams, and their children. On November 20, 2006, she owned a 1993 green Oldsmobile Cutlass Sierra, which she had purchased a couple of years earlier from a neighbor for $490. On November 20, 2006, the vehicle was not operable, but still intact. The steering column was intact, the front door lock worked properly, and the vehicle was locked. The inoperable vehicle had been parked on the street outside her home, when, on the morning of November 20, 2006,

---

[1]The first trial was a bench trial.

Wright looked out her window and realized it was gone. Wright called the police and reported it stolen.

¶ 8    Wright testified that, at some point, the police found the vehicle and she went with her husband to a junkyard to remove personal items from it. At that time, the vehicle appeared "totaled." Wright was the registered owner, she had not given anybody permission to drive or sell it, and she herself had not sold it.

¶ 9    On cross examination, Wright admitted that the vehicle had not been working "for quite a few weeks" and that she had no insurance on it. Defense counsel asked if there were any "problems" with the steering wheel or steering column when she owned the vehicle, and she replied no. Defense counsel then asked if, at a prior proceeding, she had been asked whether there was "any damage to the steering wheel or the steering column," and she had replied: "[W]hen I bought it from the lady, it was problems with it so—but as far as it seemed to be okay for me to ride in it." Wright stated that she did not "recall that." On redirect examination, Wright testified that her husband was not on the title to the vehicle and that she was the only person on the title.

¶ 10    Ronald Abrams, age 57, testified that he lived with Wright, who was his wife, and their family and that he worked as an electrician. On November 20, 2006, his wife drew his attention to the fact that her 1993 Cutlass Sierra was missing, and she called the police. His wife was "torn apart" at the thought that someone "took her car." A few hours later, the police called to notify them that the vehicle was in a "police pound." The two of them went to view the vehicle, and his wife was "in tears" when she saw it. Abrams stated: "It was a wreck." After Abrams lifted a towel covering the steering column, he observed that the column was torn up.

¶ 11    Abrams testified that, months later, in late May or early June 2007, he met defendant who asked for Abrams's help with this "situation." At a later time, defendant asked Abrams to say that Abrams sold defendant the vehicle in question and, in return, defendant offered to help his wife obtain another vehicle. Abrams did not tell his wife about this agreement with defendant. When asked about his testimony at defendant's prior trial, Abrams testified: "I lied."

¶ 12    Abrams was then asked about specific answers that he had previously provided under oath. At the prior trial, he had testified as follows about the condition of the vehicle prior to its disappearance: "[I]t was kind of beat up, a couple of flat tires. The front end had been hit. She had—she had an accident in it. It wasn't running. It was a piece of junk." When asked specifically about this question, Abrams testified, "I lied."

¶ 13    At the prior trial, Abrams had testified: "I sold the car to a guy, a tow truck driver guy. I sold it to him." The purchaser was a "guy in the neighborhood with a tow truck" who Abrams knew and who gave Abrams "40 bucks" for it. At the prior trial, Abrams had explained that he sold the vehicle because "the city came by and told me that I had to move the car or else they was going to give me some citations on the car." Again, when asked about these questions, Abrams testified, "I lied."

¶ 14    On cross examination, Abrams testified that, prior to November 20, 2006, he had tried to start the vehicle but he could not start it. On redirect examination, when asked why he lied in the prior trial, Abrams explained:

> "ABRAMS: I didn't want to see [defendant] do [a] lot of time for her car. And he promised me he will make it right by getting her a car.
>
> ASSISTANT STATE'S ATTORNEY: No further questions.

ABRAMS: He never got the car."

¶ 15 Kevin Mulhall, age 62, testified that he owned an auto repair shop. On November 20, 2006, at 8:15 a.m., he was driving a customer's Dodge Ram pickup truck with his customer as a passenger. As he proceeded into an intersection, another vehicle struck the Ram's driver-side door, and Mulhall's head hit the window. After the accident, Mulhall observed the driver of the other vehicle exit and fall down. Mulhall also observed police running toward the scene of the accident with their firearms drawn, so Mulhall ducked his head down. After a fireman knocked on his window and asked if he was okay, Mulhall realized he was dizzy, and the fireman instructed Mulhall to exit from the passenger side, which he did. Mulhall did not go to the hospital, although his passenger did.

¶ 16 Officer DeYoung[2] testified that, on November 20, 2006, he observed defendant driving a 1993 Oldsmobile up the center turning lane of a street, which is a traffic violation. DeYoung, who was in uniform and in a marked police vehicle, attempted to pull defendant over by activating his police vehicle's emergency lights and siren. Instead of pulling over, defendant sped up and headed into oncoming traffic. Specifically, defendant crossed the yellow line and attempted to go through an intersection that had four-way stop signs. Defendant's vehicle collided with a Dodge Ram pickup truck. Immediately after the accident, defendant exited his vehicle on the passenger side but fell over. DeYoung approached with his weapon drawn and placed handcuffs on defendant, taking him into custody. When asked on the scene for his name, defendant did not provide his correct name. After the accident, which occurred at 8:15 a.m., defendant was transported in an ambulance to a hospital.

¶ 17 Officer DeYoung testified that he examined the inside of defendant's vehicle and discovered that the steering column was "peeled," which he explained meant that "[t]he plastic is ripped and there's little gears where you can start the vehicle without the keys." Also, the driver's side door was "punched," which he explained meant that someone had "[p]op[ped] off the door lock and you can reach in" the hole where the lock had been "and pull on the rod and open the door."

¶ 18 DeYoung admitted that he failed to mention either the peeled steering column or the punched lock in his report and that the omission of these facts was a "mistake" on his part. DeYoung identified both a photo, which he testified showed a punched door lock, and a video from the videocam in his police vehicle depicting the accident. Both were admitted into evidence and published to the jury.

¶ 19 On cross examination, DeYoung admitted that, although he had previously testified that the fastest he had traveled in pursuit of defendant was only 48 miles per hour, the video established that he had actually traveled as fast as 77 miles per hour. DeYoung explained that the photo of the door lock was actually a still from the videocam and that no separate photos of the vehicle were taken. DeYoung denied that the photo was consistent with the lock being intact, although it depicted "silver" inside a "black ring." On redirect, DeYoung testified that there were no keys in defendant's vehicle.

¶ 20 After the certified vehicle record was admitted into evidence, the State rested, and the trial court denied defendant's motion for a direct verdict. Defendant called as his first witness Everett Myrick, who testified that he had purchased the vehicle as junk from the husband.

---

[2]When asked his name, Officer DeYoung did not provide his first name.

¶ 21    Myrick, age 69, testified that, in November 2006, he worked with defendant "towing vehicles, removing junk." Defendant owned a flatbed tow truck or "car carrier" that "picks cars up and transport[s] 'em." Defendant's business was called Miller's Towing. Myrick located customers and vehicles to "scrap[ ]," and he and defendant split the money. By "scrap[ ]," Myrick meant that they would haul the vehicle to the junkyard and receive money for it from the junkyard. By November 2006, Myrick had worked with defendant for a couple of years. At one point, Myrick had had his own business which he called Joe's Towing because "Joe is easier to remember" than Everett, which is his own first name.

¶ 22    Myrick testified that, in November 2006, he purchased a vehicle from Abrams, who Myrick knew as "Ponytail." Myrick, who lived in the neighborhood, knew that the vehicle was not running, that it had been parked on the street for a couple of months, and that "[k]ids w[ere] jumping up and down on top of it." Since Myrick lived nearby, he passed the vehicle every day. Myrick purchased it for $50 cash from Abrams, who did not have the keys and did not know where the title was. The vehicle had damage on the roof and on top of the hood, but not to the steering column. About 45 minutes after Myrick purchased the vehicle from Abrams, Myrick and defendant loaded the vehicle onto defendant's car carrier. Myrick did not recall the exact day.

¶ 23    Myrick testified that they transported the vehicle to an auto mechanic named Lawrence McKee, whose nickname is "Stuff." They took the vehicle to a mechanic because, after they loaded the vehicle onto the truck, "it seemed halfway clean, like maybe—maybe it don't need junking." The repairs took a few days.

¶ 24    Myrick testified that Abrams told him that Abrams owned the vehicle, that Abrams did not mention his wife with respect to ownership, that Myrick knew that Abrams lived at a house near where the vehicle was parked, and that $50 was "a little more" than the normal amount to pay for a vehicle for salvage. If he was purchasing a vehicle for scrap, he would not receive a title, but if he was purchasing a vehicle for resale, he would. If he purchased a vehicle for scrap and changed his mind, then he would "send for a lost title."

¶ 25    Next the defense called Lawrence McKee, the mechanic who fixed the vehicle. McKee testified that, in November 2006, he, Myrick, and defendant all worked together. Whenever the vehicles that defendant towed needed repair, McKee would repair them. Whenever McKee needed a vehicle towed, he would call defendant. McKee identified the vehicle in the photo marked as People's Exhibit No. 1 as the vehicle that he had repaired. When asked if the vehicle was a 1993 Oldsmobile Cutlass, he responded that it was "bout that year." It was similar to other vehicles made by General Motors at that time, such as a Buick, in that it was a "short body."

¶ 26    When defendant towed that vehicle to McKee, it would not start, and there were no keys. McKee's initial impression was that the vehicle was "junk." McKee explained that there was "no way" someone could start it by peeling the steering column because "[a]ll the computer accessories have to be turned on for the vehicle to run." Due to the security features of the vehicle, if you tried to "hot wire" the vehicle, the fuel pump would not work. By taking a screwdriver and touching the starter, McKee could make the engine "spin over," but it would not start. Through this test, however, he could hear that there was no damage to the engine. Once McKee realized that the engine was not damaged, he offered to install a new ignition switch and module because the existing one was damaged.

¶ 27    McKee explained that an ignition module "supplies all the electricity" to the vehicle and that, although he could make the engine "spin over by touching the starter," the vehicle would not start without a new module. McKee testified that a vehicle with a damaged ignition module, such as the one that defendant towed to him, could not possibly be "hot wired." In addition to the damaged module, the vehicle's battery was dead. However, even if the battery was replaced, the vehicle still could not start without a new module because the module is "the brain box to the whole car."

¶ 28    McKee testified that he repaired the vehicle in a couple of days and gave defendant a key. After the repairs, defendant used that key to drive the vehicle away. The locks were not punched when the vehicle was brought to McKee or when defendant drove the vehicle away.

¶ 29    On cross examination, McKee testified that Myrick was not with defendant when defendant brought this vehicle to McKee. A week before trial, a man from the Cook County State's Attorney's Office came to speak to McKee and gave McKee a piece of paper with the time and day he had to be in court. McKee told this man that McKee did not recall "the exact date and time and year" that he worked on the vehicle because "it's been so long." McKee told him that McKee changed the ignition module. When the man asked if McKee gave the vehicle a tune-up and an oil change too, McKee told him that he probably had. McKee agreed that he told the man that he "could not recall the vehicle being a Buick, short body style." However, McKee now recalled that it was a Buick, "short body car." The roof had no dents and did not look like people had been jumping on it.

¶ 30    On redirect examination, McKee testified that he had no doubt that the vehicle depicted in People's Exhibit No. 1 was the vehicle that he repaired. General Motors made both a Buick Regal and an Oldsmobile Cutlass, and parts from a Buick could be used in an Oldsmobile, within a three-year period of time. Depending on the model, the engine in a 1993 Buick could be "interchange[d]" with a 1993 Oldsmobile. The vehicle in the photo looked like a Buick LeSabre or Park Avenue.

¶ 31    After McKee's testimony, the defense rested.

¶ 32    At the subsequent jury instruction conference, defendant tendered jury instructions regarding both reasonable belief and mistake of fact. Defendant argued that the reasonable belief instruction was appropriate because Myrick had a reasonable belief that Abrams was the owner of the vehicle when Myrick purchased the vehicle. Defendant argued that Myrick's reasonable belief and mistake of fact were both attributable to defendant through his reliance on Myrick.

¶ 33    Since the proposed mistake instructions are the sole issue for us on appeal,[3] we provide them here in full. The definitional instruction for mistake of fact stated: "A defendant's mistake of fact as to a matter of fact is a defense if the mistake shows that the defendant did not have the [(intent) (knowledge) (recklessness)] necessary for the offense charged." Defendant's proposed issues instruction for mistake of fact stated: "__ *Proposition*: That the defendant was not mistaken as to a matter of fact that would show he did not have the [(intent) (knowledge) recklessness)] necessary for the offense charged."

_____

[3]Defendant does not raise arguments on appeal concerning the denial of the reasonable belief instruction.

¶ 34    Turning to the reasonable belief instruction first, the State argued that any belief was Myrick's, not defendant's belief, and therefore, the instruction should not be given. The trial court agreed.

¶ 35    With respect to the mistake instructions, defense counsel argued:

"If the jurors find that there was a mistake of fact, that mistake of fact would be attributable to Mr. Myrick, and secondly to [defendant].

The Court heard testimony on that. We believe that this case—we believe that the jury could potentially consider there to ha[ve] been a mistake of fact, and that it would be proper to give them an instruction so that if that is how the jury views this case, then they would be able to rule appropriately."

In response, the State argued that its argument with respect to the mistake instructions was the same as for the reasonable belief instruction.

¶ 36    In addition, the State argued that "[t]here has been no evidence presented that the defendant had any understanding one way or the other." The trial court responded:

"THE COURT: I agree.

That the jury is already going to be instructed regarding the mental state, and I think that this would just confuse the jury even more. It will not be given."

¶ 37    At the end of the State's initial closing argument, the prosecutor summed up by arguing, "This wasn't a mistake, ladies and gentlemen ***." In response, the defense argued that the State had failed to prove that the vehicle was stolen or, even if it was stolen, that defendant knew it was stolen. The defense argued that, if the vehicle was stolen, it was stolen by Abrams, the owner's husband. The defense conceded that defendant "made a mistake in eluding the police officer." In rebuttal, the State argued that "[i]t was a big mistake for him to rely on his friends, Everett and Lawrence to come in here and get him out of this jam he's in; a big mistake."

¶ 38    After listening to the evidence, closing arguments, and jury instructions, the jury found defendant guilty of the aggravated possession of a stolen motor vehicle.

¶ 39    Defendant filed a posttrial motion for a new trial that claimed, among other things, that the trial court erred by denying his tendered mistake-of-fact jury instructions. At the posttrial hearing on December 15, 2017, defendant argued that "he was mistaken about the fact that Ronald Abrams was the owner of the car." Defendant argued that "if there was a mistake of fact by Mr. Myrick caused by the misrepresentation of Ronald Abrams, that—that should be granted to [defendant] acting through his agent Mr. Myrick." The State argued, as it had at the jury instruction conference, that the defense's proposed instructions "would have confused" the jury. After listening to the parties' arguments, the trial court denied defendant's motion, stating, "I stand by my rulings."

¶ 40    On December 15, 2017, after considering factors in aggravation and mitigation, the trial court sentenced defendant to 15 years with IDOC. On December 21, 2017, defendant filed a notice of appeal, and this timely appeal followed.

¶ 41                                  ANALYSIS

¶ 42    In the instant appeal, defendant claims that the trial court erred in denying his tendered jury instructions. To preserve a jury instruction error for review on appeal, a party must (1) object to a proposed instruction or tender one of his own and (2) raise the issue again in a posttrial

- 7 -

motion. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). In the case at bar, defendant both tendered instructions to the trial court and raised the issue again in a posttrial motion, thereby preserving the alleged error for our review. The State does not argue otherwise.

¶ 43 When a criminal defendant has preserved an issue for our review, the burden is on the State to show that the error, if there was one, was harmless beyond a reasonable doubt. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). An error is considered harmless if it appears beyond a reasonable doubt that it did not contribute to the verdict. *People v. King*, 2020 IL 123926, ¶ 40.

¶ 44 Generally, the decision regarding whether to give a particular jury instruction rests within the sound discretion of the trial court. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). However, "[a] defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury." *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997). "Very slight evidence upon a given theory of a case will justify the giving of an instruction." *Jones*, 175 Ill. 2d at 132. " 'In deciding whether to instruct on a certain theory, the court's role is to determine whether there is some evidence supporting that theory; it is not the court's role to weigh the evidence.' " *Jones*, 175 Ill. 2d at 132 (quoting *People v. Jones*, 276 Ill. App. 3d 1006, 1012 (1995) (Cook, P.J., dissenting)).

¶ 45 "A person's ignorance or mistake as to a matter of either fact or law" is an affirmative defense "if it negatives the existence of the mental state which the statute prescribes with respect to an element of the offense." 720 ILCS 5/4-8(a) (West 2020). In the case at bar, defendant was convicted of the aggravated possession of a stolen motor vehicle while disregarding the signal of a police officer. 625 ILCS 5/4-103.2(a)(7)(A) (West 2020). To sustain this charge, the State had to prove, among other things, (1) that defendant is "the driver or operator" of the vehicle, (2) that he is "not entitled to the possession of that vehicle," and (3) that he "knows the vehicle is stolen or converted." 625 ILCS 5/4-103.2(a)(7)(A) (West 2020). Thus, defendant's knowledge that the vehicle is stolen or converted is an element of the offense which the State must prove, and mistake of fact is an affirmative defense that negates this element.

¶ 46 If an affirmative defense is raised, "then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." 720 ILCS 5/3-2(b) (West 2020).

¶ 47 At the jury instruction conference, the State argued that "no evidence" had been "presented" regarding defendant's "understanding" and the trial court adopted the State's argument, stating flatly, "I agree." However, "defendant was not required to testify" in support of his proposed affirmative defense. *Jones*, 175 Ill. 2d at 133. "Indeed, mental states are not commonly proved by direct evidence, but are more often inferred from the character of a defendant's acts and the circumstances surrounding the commission of the offense." *Jones*, 175 Ill. 2d at 133. A defendant is not required to "offer any evidence" at all, if the State's evidence raised the issue. *Jones*, 175 Ill. 2d at 133. A defendant is "excused from presenting any evidence" concerning his proposed defense, "where the evidence presented by the State raises the issue of the affirmative defense." *Jones*, 175 Ill. 2d at 132.

¶ 48 "In essence, unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of a law that there is no affirmative defense, the issue of whether a defendant should be relieved of criminal liability by reason of his affirmative defense must

be determined by the jury with proper instruction as to the applicable law." *Jones*, 175 Ill. 2d at 132. This was not the standard applied by the trial court.

¶ 49 In the case at bar, defendant more than met the "some evidence" standard. *Jones*, 175 Ill. 2d at 132. Myrick testified that he purchased the vehicle as junk from the owner's husband. All the witnesses—both the State and the defense's witnesses—corroborated Myrick's testimony that the vehicle had been inoperable for some time and left on the street that way.[4] McKee testified that it took him a couple of days to transform it from inoperable junk to a working vehicle. If there was a doubt about whether defendant had raised enough evidence to justify the giving of a mistake instruction, we note that even the State in its rebuttal closing argued that defendant made "a mistake" in relying on Myrick and McKee.

¶ 50 In addition to testimony by Myrick and McKee, the "some evidence" included the testimony of the husband, the lynchpin in these agreements. *Jones*, 175 Ill. 2d at 132. At the first trial, he testified under oath that he agreed to, and did, sell the vehicle as junk to Myrick. At the second trial, he claimed that he had a different agreement—that he would lie for defendant at the first trial and, in return, defendant would give him another vehicle for his wife. However, according to the husband, defendant failed to deliver the promised vehicle and, at the second trial, the husband did an about-face in his testimony. The record contained more than some evidence that any reliance on the husband for facts was a mistake.

¶ 51 At the instruction conference, the State argued that the trial court should reject the proposed instructions because there was no evidence presented regarding defendant's "understanding," and the court "agree[d]." However, as we already discussed above, defendant had no obligation to testify in order to obtain the instruction.

¶ 52 The State also argued that the mistake of fact was Myrick's, not defendant's, mistake. However, to the extent that defendant relied on Myrick's purchase as legitimate, it was defendant's mistake as well.

¶ 53 On appeal, the State now argues that the instruction was not warranted because the defense did not explicitly ask Myrick if Myrick informed defendant about Myrick's purchase of the vehicle from the husband. This argument turns the burden of proof on its head. It is the State's burden to prove defendant's knowledge that the vehicle was stolen or converted. See 625 ILCS 5/4-103.2(a)(7)(A) (West 2020) (he "knows the vehicle is stolen or converted"). It is not the defendant's burden to affirmatively prove that he knew it was legitimately acquired. The record contains "some evidence" from which a person in defendant's shoes may have reasonably, but mistakenly, inferred a legitimate acquisition.[5] See *Jones*, 175 Ill. 2d at 132. And this court so found in our prior opinion. *Miller*, 2013 IL App (1st) 110878, ¶ 56 (if one credited Myrick's

---

[4]As this court previously observed, "the fact that Myrick did not receive the title or keys to the vehicle is not inconsistent with the defense's statement of the fact. Defendant purchased the vehicle as junk, which does not carry the same requirements for transfer of title and keys as is required for the sale of a functioning automobile. 625 ILCS 5/3-117.1 (West 2006)." *Miller*, 2013 IL App (1st) 110879, ¶ 60.

[5]The State further argues that the defense failed to ask Myrick for details about the nature of their business relationship, such that defendant would be able to rely on it in assuming the legitimacy of Myrick's acquisition. Again, it was the State's burden to expose irregularities with their business relationship, if any, and if the State believed these facts relevant to satisfy its burden to prove defendant's knowledge that the vehicle was stolen or converted.

testimony, "a person in [defendant's] position would not have believed that the vehicle was stolen"). A defendant's knowledge or state of mind is more often inferred by the factfinder from "the circumstances surrounding the commission of the offense" than from direct evidence. *Jones*, 175 Ill. 2d at 133. "[D]efendant was not required to testify or offer any evidence" in support of his affirmative defense, so long as there was some evidence in the record to support it. *Jones*, 175 Ill. 2d at 133.

¶ 54   For the foregoing reasons, we do not find the State's arguments persuasive, and we find that there was considerably more than "some evidence" to support the giving of the instruction. See *Jones*, 175 Ill. 2d at 132.

¶ 55   As noted above, this error was preserved for our review, and we cannot find it harmless beyond a reasonable doubt. *McLaurin*, 235 Ill. 2d at 495. The State argues that the evidence in this case was overwhelming and points again to the fact that defendant did not testify. As we have repeatedly noted, defendant did not have to testify. Far from overwhelming, this court previously found the evidence in this case was "close," when we reversed and remanded once before. See *Miller*, 2013 IL App (1st) 110879, ¶ 65 ("the evidence in this case was close"). On remand, the husband's repeated admissions of lying under oath did not make the case substantially stronger. Thus, we cannot find this error regarding a principal issue in the case to be harmless beyond a reasonable doubt.

¶ 56                                  CONCLUSION

¶ 57   For the foregoing reasons, we reverse and remand for a new trial.

¶ 58   Reversed and remanded.