2022 IL App (1st) 191239-U

FIFTH DIVISION
May 20, 2022

No. 1-19-1239

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CR 15749 |
| | ) | |
| THOMAS MARTIN, | ) | |
| | ) | Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defense counsel affirmatively acquiesced to trial judge's response to jury notes, so matter would not be reviewed for plain error; counsel was not ineffective for not requesting a mistrial or further inquiry of the jurors; error in not instructing jury on series of acts exception to the statute of limitations was harmless; affirmed.

¶ 2    After a jury trial, defendant, Thomas Martin, was convicted of theft and wire fraud and sentenced to 30 months of probation. On appeal, Martin contends that (1) the trial court should have taken further action in response to two sets of juror questions, (2) defense counsel was

ineffective for not requesting a mistrial or an inquiry of a jury after the questions were received, and (3) the jury should have been instructed on the series of acts exception to the statute of limitations. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      Martin was the founder of Antares Iron & Copper, Inc. (Antares), and operated the business until 2012. In 2007, Martin established a 401(k) plan for his employees, to which only Antares contributed. In 2010 and 2013, Martin withdrew approximately $79,000 from the 401(k) plan. The 2010 withdrawals were deposited into Antares's operating account, and the 2013 withdrawal was cashed at a currency exchange.

¶ 5      On October 14, 2016, the grand jury returned a two-count indictment that charged Martin with theft and wire fraud. Count 1 stated that "on or about February 25, 2010 and continuing on through October 24, 2013," Martin committed theft,

> "in that in furtherance of a single intention and design, on two or more occasions between the said dates, he knowingly exerted unauthorized control over property of the owner, beneficiaries of the [Antares] 401(k) plan trust, that the value of the property, to wit: money and checks, in the aggregate exceeded $10,000, and he intended to deprive the owner permanently of the use and benefit of that property, and that pursuant to Chapter 720, Section 5/3-8 when an offense is based on a series of acts performed at different times, the period of limitations starts at the time when the last such act is committed, and that the defendant exerted unauthorized control over the property of the said owner on at least one occasion after October 14, 2013 *** ."

Count 2 stated that "on or about February 25, 2010 and continuing on through October 24, 2013," Martin committed wire fraud,

> "in that the Defendant knowingly devised a scheme to defraud the beneficiaries of the [Antares] 401(k) plan trust of money or property, to wit: he caused funds from the 401(k) plan *** to be withdrawn and deposited into the bank accounts of [Antares] or converted to cash, and that for the purpose of executing the scheme on two or more occasions between the said dates, the Defendant caused electronic impulses by means of wire to be transmitted within Cook County and that he caused electronic impulses to be sent in furtherance of the scheme on at least one occasion after October 14, 2013 ***."

¶ 6     At the start of the ensuing trial, the judge admonished the jury,

> "not to form any opinion and that's essential that you not arrive at any decision or conclusions of any kind until you've heard all the evidence, the final arguments of the lawyers and the law and have begun your deliberations in the privacy of the jury room. You are to keep an open mind until that time."

¶ 7     Mary Jo Stvan testified for the State that she was the president and owner of Merit Benefits Group, which administered Antares's 401(k) plan. Martin designed the plan such that all employees were immediately vested in their accounts. The money in the plan was for the benefit of the participants and not the employer. All of the participants shared in the funds equally, and all of the money that went into the plan was contributed by Antares. Stvan explained the applicable bonding provisions, which allow for employees to be paid even if money is lost.

¶ 8     After Stvan's testimony, the trial went into recess and the judge reminded the jury,

"not to discuss the case with anybody. Don't discuss it amongst yourselves. You haven't heard all of the case yet. A fair thing to do is to keep an open mind, but please don't discuss any of the evidence that you heard or the opening statements that were given just before the evidence."

¶ 9    Simon Mangiurea, a former investigator for the federal Department of Labor, testified for the State that when he spoke to Martin in May 2014, Martin stated in part as follows. Martin set up a 401(k) plan to incentivize his employees to work hard and help them save money. Contributions were made when Antares finished a job. In 2010, Antares experienced financial problems. That May, Martin held a meeting with his employees to tell them he would liquidate Antares's assets to keep the company running. No one openly objected. Mangiurea identified exhibits that documented: (1) the February 2010 transfer of $53,369.73 from Appalachian Community Bank and depositing the funds into Antares's account, (2) the June 2010 transfer of $10,615.02 from Bank of America to Antares's account, and (3) the July 2010 transfer of $10,839.67 from the National Bank of Kansas City to Antares's account. On October 15, 2013, Martin called Vanguard and instructed the company to close down an account. The next day, Vanguard issued a check for $4,753. On October 24, 2013, Martin cashed the check at a currency exchange.

¶ 10   Mary Margaret Noone testified for the State that she worked at Antares until 2008. In 2009, Noone received a letter from Martin stating that her 401(k) funds of $2,076.92 would be paid out to her. Noone set up an account so that she could rollover the funds, and sent Martin a corresponding form in March 2010. After Noone did not receive the funds, she contacted Martin, who told Noone that he was having a hard time, but "would get it fixed." In August 2010, Martin again told Noone "that he would get himself together and take care of the rollover" by the year's

end. Noone's 401(k) funds were never transferred. Martin did not ask Noone's permission to use her 401(k) funds to put money into Antares.

¶ 11    Alberto Alamo testified for the State that he worked at Antares until early 2011. At one point, Martin mentioned a 401(k) plan to Alamo and others, but Alamo never received any related paperwork. A document indicated that at one point, Alamo had $18,846.28 in his account. Martin never asked Alamo if he could use his 401(k) funds to keep the business running. Alamo never received any money from his 401(k).

¶ 12    Paul Spiro testified for the State that he worked at Antares until 2009. When Spiro left, Martin told him that he had $16,500 in a 401(k) account, which would be distributed to Spiro at the end of the year. After Spiro did not receive the funds, he called Martin, who confirmed that Spiro would be paid. Martin later told Spiro that he would receive the money by the end of 2011. Spiro eventually stopped trying to receive the funds. Spiro did not give Martin permission to use the 401(k) funds for Antares.

¶ 13    After Spiro's testimony and before recessing for the day, the judge told the jury, "The case hasn't finished yet, so I'm going to remind you not to discuss it with anybody. Don't allow anyone to discuss the testimony or what you heard with you."

¶ 14    The State rested, and the defense moved for a directed verdict. In part, defense counsel asserted that the State had to prove that the last act alleged in the indictment occurred within the statute of limitations period. Defense counsel stated that the last act—closing out the Vanguard account—occurred after Antares dissolved. In response, the State contended that negotiating the final check at a currency exchange was an act in furtherance of the scheme to defraud where the owners of the funds were the beneficiaries of the 401(k). The trial court denied the motion for a directed verdict.

¶ 15    The trial turned to the defense's witnesses. At one point, the jury was briefly excused from the courtroom while the parties discussed an objection. Before the jury left, the judge stated, "[P]lease don't discuss any of the testimony that you heard on the case amongst yourselves or allow anyone to discuss it with you."

¶ 16    Stanislaw Planica testified through an interpreter that he worked at Antares until 2011. Planica received bonuses and gifts every year except in 2010, when the company was not doing well. Planica also recalled that in early 2010, he attended a meeting with Martin about Antares's struggles. Martin mentioned using money to help the company. The trial was the first time that Planica learned that he had over $25,000 in a 401(k) account. Martin did not specifically ask Planica's permission to use the 401(k) money. Martin gave Planica $5,000 when Planica's wife died.

¶ 17    Marcelo Martinez testified through an interpreter that he worked at Antares until 2012, and recalled enrolling in the 401(k) plan. Martinez described various payments he received other than his paychecks, including bonuses and a $19,000 check. Martinez recalled that there were meetings where Martin talked about using money to run Antares, but Martinez "didn't really understand what he was talking about." The trial was the first time he learned that his 401(k) account contained $3,792.14.

¶ 18    Ruben Jara testified that he worked at Antares until 2012, and he knew he was a participant in the 401(k) plan. While employed at Antares, Martin gave Jara a new truck and bonuses. Jara did not recall receiving paperwork about the 401(k) plan when he left, and did not know his 401(k) account had $3,961.20. Jara was not at the meeting where Martin discussed using the 401(k) funds to run Antares. However, if Martin did not invest the money in Antares, the employees would have

been out of work, and so he told Martin, "I have no problem with that \*\*\* ." Jara also stated that he "didn't even know we had the money."

¶ 19    After Jara's testimony and before breaking for a recess, the judge admonished the jury, "I'm going to remind you not to discuss the case with anybody. Do not let anyone discuss the case in your presence. Although we're breaking for lunch, we haven't finished the case yet, so please do not discuss the case amongst yourselves during this recess."

¶ 20    Returning to the proceedings, Martin testified that he contacted Merit Benefits Group because he wanted to set up a profit sharing plan. Martin contributed to the plan starting in July 2007 for about six months, and "every penny" was bonded. In 2007 and 2008, the economy crashed and Antares began losing money. In February 2010, Martin called a meeting where he told several employees that the company was in trouble and he needed more money to keep the business running. Antares ultimately closed in April 2012. Martin spoke with an attorney around September 2013 and learned that there was bond and insurance money to cover any claims against the 401(k) plan. The next month, Martin withdrew the final funds from the plan, intending to give some of the money to himself and pay back Marcelo and Stanley for personal loans. Martin admitted that he breached his fiduciary duties as a civil matter.

¶ 21    The defense rested and the jury was excused for the day. The judge told the jury,

> "Again, I'm going to remind you not to discuss the case with anybody. Don't let anyone discuss this case in your presence. Don't research anything online about the case, about the issues that you heard, or the law that you might think applies to this case. Fair thing to do is keep an open mind."

¶ 22    At the jury instruction conference, defense counsel stated it was an element of the offense that must be proven beyond a reasonable doubt that the last act in October 2013 was part of a single

intention and design. The court disagreed, noting that the State would be required to prove an exception or extension of the statute of limitations if the alleged crime was clearly beyond the ordinary statute of limitations in the charging document, which was not the case here.

¶ 23    Before the jury returned for closing arguments, the judge announced that the deputy sheriff received two notes from the jurors. The first note was sent at 10:20 am, and "Grace H." was written at the top. The note stated:

> "1) Please explain bonding – what does that mean? How is it relevant?
>
> 2) What is the difference between profit sharing + a 401k plan?
>
> 3) What did he set up? A profit sharing plan or a 401k plan?
>
> 4) What defines a criminal vs civil case?
>
> 5) He met with an attorney after closing the business – what was discussed in that meeting? Was what to do with his profit sharing plan explained? (to him)"

The judge proposed telling the jurors that they were to decide the case based on the evidence they heard. The jurors would be instructed on the law that they were to follow in making decisions. The judge "can't answer these questions for you." Defense counsel stated, "That's fine with the Defense." The State agreed.

¶ 24    The second note was sent at 10:25 am, and "Cierra" was written at the top. The note stated:

> "With Exhibit C, are those address [*sic*] to his company or his home?
>
> What was the $19,000 given to Marcelo for?"

The judge proposed instructing the jurors that they had heard all of the evidence in the case, and were to resolve any questions of fact based on the evidence they received, including exhibits. Also, the jurors had yet to be instructed on the law. The judge asked, "Would that suffice?" Defense counsel responded, "Yes, Judge."

¶ 25    When the jurors were seated, the judge addressed the notes:

"Now, I did receive two separate notes from the deputy that she indicated came from the jury room, which indicates one of you wrote these notes out with the particular questions.

I don't know if you discussed those. I expect that nothing has been discussed amongst yourselves; that each of you followed the instructions not to discuss the case or the issues in the case.

Now, as far as questions that were put out – actually, there were two names on the separate notes – the evidence that you have received both by way of testimony and exhibits is what – the facts are what the case – the evidence in the case is. The facts of the case will be determined by you as a group as jurors during your deliberations at the end of the case. Before that happens, I will instruct you as to the law.

Considering the law and the facts as you determine them to be from the evidence and the exhibits that you received and stipulations that you heard, you will decide the case. But that's after you have heard the arguments of the lawyers, been instructed on the law by the court, received the exhibits which were admitted into evidence. At that point, during your jury deliberations, you will – based on those instructions of the law, decide the case in that way."

¶ 26    After hearing closing arguments and receiving instructions, the jury began deliberating at 11:56 am. The jury reached a verdict at 12:50 pm, finding Martin guilty of theft and wire fraud.

¶ 27    Martin filed a posttrial motion, asserting that he was prejudiced by juror misconduct. The two notes suggested that the jurors discussed key elements of the evidence during the trial. Though

defense counsel did not object, the court should have *sua sponte* declared a mistrial or investigated the alleged misconduct more thoroughly. Martin further stated that the court incorrectly refused his proposed instruction that the State must prove beyond a reasonable doubt that the last withdrawal of funds was part of a single intent and design and part of a single scheme to defraud.

¶ 28    The court denied Martin's motion after a hearing. According to the court, the proper inference was that the jurors had individual questions, followed the law, and considered the admonishments not to discuss the case until the evidence was finished, the lawyers' arguments were heard, and instructions were given.

¶ 29    After a hearing, Martin was sentenced to 30 months of probation. Martin timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31    Martin contends that the court should have responded differently to the notes from the jury. Martin argues that the existence of two sets of questions and the delayed start before closing arguments support an inference that the jurors engaged in premature discussions. The questions indicated that the jurors expected Martin to provide evidence or a better explanation to prove his innocence. Also, the second note's question about the money given to Marcelo was a sign that the juror may not have been paying close attention. Martin states that the court should have inquired whether the jurors had discussed the case and whether the jurors could remain fair and impartial.

¶ 32    " '[I]t is improper for jurors to discuss the case among themselves or any subject connected with the trial until all of the evidence has been presented and the case has been submitted to them after final instructions by the trial court.' " *People v. Cloutier*, 178 Ill. 2d 141, 160 (1997) (quoting 75B Am.Jur.2d *Trial*, § 1610, at 379-80 (1992)). Yet, it may be unrealistic to think that jurors will never comment to each other about any matter related to a trial. *People v. Runge*, 234 Ill. 2d 68, 129 (2009). The key question in deciding whether misconduct denied the defendant a fair trial is

not whether the jurors kept silent about the case, but whether each juror kept an open mind until the case was submitted to them. *Cloutier*, 178 Ill. 2d at 161. A trial judge has broad discretion to respond to an allegation of jury misconduct, " 'and that discretion is at its broadest when the allegation involves internal misconduct such as internal deliberations.' " *Runge*, 234 Ill. 2d at 105 (quoting *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000)).

¶ 33     To preserve an error for review, a defendant must object at trial and include the error in a posttrial motion. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). Recognizing that his counsel did not object to the court's response to the jurors' questions, Martin urges that we review his claim for plain error. We will not do so because plain error review applies to cases that involve procedural default, not affirmative acquiescence (*People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29), and Martin's counsel affirmatively agreed with the court's response. A defendant's invitation or agreement to a procedure later challenged on appeal " 'goes beyond mere waiver.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). Under the doctrine of invited error, a defendant may not ask to proceed in one way and then later challenge that course of action on appeal. (Internal quotation marks omitted.) *Id.* (quoting *Villarreal*, 198 Ill. 2d at 227).

¶ 34     Martin suggests that issues of juror misconduct and a potentially biased jury before closing arguments should be excepted from the doctrine of invited error, but there is no basis for such a result. Illinois courts have applied the invited error doctrine to claims that a court improperly responded to questions during deliberations. See *Averett*, 237 Ill. 2d at 23-24 (2010); *People v. Lawrence*, 2018 IL App (1st) 161267, ¶¶ 52-53. Similar concerns about the right to be tried by an impartial jury are present whenever the alleged jury misconduct occurred. See *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 36 (in case involving premature deliberations, stating that trial before

a biased jury would amount to a structural error); *People v. Peel*, 2018 IL App (4th) 160100, ¶ 35 (in case involving interaction with the jury during deliberations, noting that the integrity of the jury's verdict must be protected from coercion, duress, or influence). We decline to carve out an exception to the invited error doctrine here.

¶ 35    Though plain error review is not available, we will address Martin's claim that his counsel was ineffective for not moving for a mistrial or requesting an inquiry of the jury after the court received the two notes. See *id.* ¶ 36 (where the defendant affirmatively acquiesced to the alleged error, claim could still be reviewed for ineffective assistance of counsel). Martin argues that the fact that the court received two sets of questions and the critical nature of the questions should have alerted counsel to the danger that the jury may have formed an opinion against Martin before closing arguments. There was no strategic reason not to ask for measures to ensure that Martin received a fair trial. According to Martin, a brief inquiry would have confirmed whether the jurors engaged in premature deliberations and determined the verdict before closing arguments. Martin notes that the jury ultimately reached its verdict almost immediately.

¶ 36    To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel must have made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* Judicial scrutiny of counsel's performance is highly deferential, and a defendant must overcome the strong presumption that the challenged conduct was the product of sound trial strategy and not incompetence. *People v. Haynes*, 192 Ill. 2d 437, 473 (2000). As for prejudice, a defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* A defendant must satisfy both the performance and prejudice prongs

of the *Strickland* test, and a failure to satisfy one of the prongs precludes a finding that counsel was ineffective. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 11.

¶ 37    Here, Martin's counsel was not deficient because the trial court's response to the jurors' questions was entirely proper. The two sets of questions were signed by individual jurors. The questions were neutral and did not indicate that the jurors had formed an opinion about Martin's innocence. Further, throughout the trial, the judge repeatedly admonished the jurors not to discuss the case. Under these circumstances, the court's response—that the jurors would consider the law and facts from the evidence after hearing argument and receiving instructions—sufficiently addressed the notes. Sometimes, less is more when it comes to investigating alleged juror misconduct, and a trial court must assess the particular circumstances to decide whether questioning individual jurors might compound the problem by drawing attention to it. *Runge*, 234 Ill. 2d at 104. The two jurors' questions did not indicate that they could not keep an open mind— indeed, they equally suggest that the jurors had not decided Martin's guilt and were trying to clarify the evidence presented. There was no basis for a mistrial and a further inquiry was not necessary. See *Cloutier*, 178 Ill. 2d at 163 (counsel not ineffective for not moving for a mistrial where the jurors requested a chronological list of events, and any discussion on the desirability of that list was at most a nonprejudicial technical violation of the trial court's admonishments). That the jury deliberated for about an hour does not, alone, suggest that the jurors started deliberating prematurely. The trial was relatively short and the issues were not particularly complex. Before we attach great significance to the length of the deliberations, there must be a reason to suspect that the jury disregarded its instructions or otherwise failed in its duty (*United States v. Cunningham*, 108 F.3d 120, 124 (7th Cir. 1997)), which did not occur here. With no error in the

court's response, Martin's counsel did not perform deficiently by not moving for a mistrial or seeking further inquiry, and so he was not ineffective.

¶ 38    Lastly, Martin contends that the jury should have been given an instruction about whether the State timely commenced his prosecution, which was an element of the alleged offenses. Martin notes that the statute of limitations period for theft and wire fraud is three years. The initial withdrawals took place in 2010, and Martin was charged in 2016. The State relied on Martin's phone call to Vanguard on October 15, 2013, Vanguard's issuing the check on October 16, 2013, and Martin's act of cashing the check on October 24, 2013, to bring all of the 401(k) withdrawals into one charge and thus within the series of acts exception to the statute of limitations. Martin argues that the State had to prove the facts supporting the exception as an element of its case.

¶ 39    Jury instructions provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). "[F]undamental fairness requires that the trial court fully and properly instruct the jury on the elements of the offense," among other topics. *Id.* We review *de novo* whether jury instructions accurately conveyed the applicable law. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 40    Sections 3-5 through 3-8 of the Criminal Code of 2012 (Code) (720 ILCS 5/3-5 to 3-8 (West 2012)) address the statute of limitations for criminal offenses. Felony prosecutions for theft and wire fraud must be commenced within three years of the commission of the offense. 720 ILCS 5/3-5(b) (West 2012). Section 3-6 of the Code (720 ILCS 5/3-6 (West 2012)) provides circumstances under which the statute of limitations may be extended. Section 3-7 of the Code (720 ILCS 5/3-7 (West 2012)) sets out periods that are excluded from the running of the statute of limitations. Section 3-8, invoked here and known as the series of acts exception, states, "When an offense is based on a series of acts performed at different times, the period of limitation *** starts

at the time when the last such act is committed." 720 ILCS 5/3-8 (West 2012). See also *People v. Curoe*, 97 Ill. App. 3d 258, 264 (1981) (proof of the defendant's intent when he committed the last act determined whether he could be found guilty of the last act as well as prosecuted for the acts that previously occurred).

¶ 41    The question here is whether the State was required to prove, as an element of the offenses at trial, that the series of acts exception applied. We briefly summarize the case law on this matter. In *People v. Morris*, 135 Ill. 2d 540, 546 (1990), our supreme court stated that when an indictment on its face shows that the offense was not committed within the statute of limitations, "it becomes an element of the State's case to allege and prove the existence of facts which invoke an exception to the limitation period." In *People v. Gray*, 396 Ill. App. 3d 216, 224 (2009), the court explained that the State does not need to prove to the jury in every case the circumstances that justify an extension or tolling of the statute of limitations. If the issue can be raised and argued before trial— such as through a motion to dismiss—the decision of whether there are circumstances to extend or toll the statute of limitations is not a jury question. *Id*. at 227. A defendant would have no basis for challenging the charging document if it sufficiently alleged that the crime occurred within the statute of limitations. *Id*. at 226. But a factual issue about the statute of limitations could arise at trial through witness testimony or documentary evidence, and there, "the factual issue would be resolved by the jury and the jury would be instructed regarding the applicable law." *Id*.

¶ 42    In *People v. Lutter*, 2015 IL App (2d) 140139, ¶ 11, the court went further, stating that an exception to the statute of limitations was an element of the State's case, and so a defendant could not forfeit the issue by failing to raise it before trial. In *Lutter*, the charging document "vaguely alleged facts that would arguably toll the limitations period," but the State offered no evidence of

those facts at trial. *Id*. ¶ 8. "[T]he State was not relieved of the burden of proving the exception at trial." *Id*. ¶ 11.

¶ 43      After *Lutter*, our legislature enacted Public Act 100-434 (eff. Jan. 1, 2018), which added new language to sections 3-6 and 3-7 of the Code. Under the new framework, the State "shall not be required to prove at trial facts which extend the general limitations in Section 3-5 of this Code when the facts supporting extension of the period of general limitations are properly pled in the charging document. Any challenge relating to the extension of the general limitations period as defined in this Section shall be exclusively conducted under Section 114-1 of the Code of Criminal Procedure of 1963." Pub. Act 100-434 (eff. Jan. 1, 2018) (amending 720 ILCS 5/3-6, 3-7). As Martin points out, Public Act 100-434 did not add this language to the series of acts exception in section 3-8.

¶ 44      Without deciding as a general matter that the State must always prove the series of acts exception as an element of the offense at trial, we conclude that a corresponding jury instruction should have been given at Martin's trial. The committee notes to the jury instruction on exceptions to the statute of limitations states that notwithstanding Public Act 100-434, the instruction should still be used in cases where the alleged offense occurred before January 1, 2018, "and the court determines an exception or exclusion is a material issue." Illinois Pattern Jury Instructions, Criminal, No. 24-25.23 (approved Oct. 29, 2021). The committee note lists sections 3-5, 3-6, 3-7, and 3-8 of the Code. Martin's alleged offenses occurred before 2018, and Martin raised the series of acts exception at trial. Without the exception, Martin could not be prosecuted for the offenses as charged.

¶ 45      Still, any error in not providing the instruction was harmless. See *People v. Miller*, 2021 IL App (1st) 190060, ¶ 43 (where a defendant has preserved an issue for review, the State must

show that the error was harmless beyond a reasonable doubt). An error is harmless if it appears beyond a reasonable doubt that it did not contribute to the verdict. *Id*.

¶ 46     For the theft charge, the State had to prove that in furtherance of a single intention and design, Matin knowingly exerted unauthorized control over the property of the beneficiaries of the 401(k), and intended to deprive the beneficiaries permanently of the use and benefit of that property. See 720 ILCS 5/16-1(a)(1)(A) (West 2012); 725 ILCS 5/111-4(c) (West 2012). For wire fraud, the State had to prove that Martin knowingly devised a scheme to defraud the beneficiaries and caused wire communications to be transmitted in furtherance of the scheme. See 720 ILCS 5/17-24 (West 2012). All of the transactions had to be a series of acts. 720 ILCS 5/3-8 (West 2012).

¶ 47     Martin contends that any scheme was complete when he used the money to keep Antares afloat. Martin argues that the three-year gap between his 2010 transactions and his cashing of the Vanguard check in 2013—after Antares closed—refutes the conclusion that the 2013 transaction was done with the same intent or in furtherance of the same scheme as the 2010 transactions.

¶ 48     At trial, Martin stated that when he withdrew the final funds from the 401(k) account in 2013, he intended to use the money for himself and to repay two people for personal loans. It is immaterial why Martin withdrew the 401(k) funds each time. Proof of a single intention is required—motive is not. See *People v. Moore*, 2021 IL App (1st) 172811, ¶ 188 (reasons why the defendant committed the crimes was not something that the State was required to prove). On multiple occasions, Martin raided the 401(k) funds without permission for his own reasons, with no plan to pay the beneficiaries back, as evidenced by testimony from witnesses that Martin evaded their attempts to recoup their 401(k) funds. All of the withdrawals were part of the same series of acts, and the court's failure to instruct the jury on the series of acts exception was harmless. See

*People v. Clark*, 71 Ill. App. 3d 381, 411 (1979) (where acts complained of before and after certain

date were essentially the same, failure to instruct was harmless).

¶ 49                                    III. CONCLUSION

¶ 50    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 51    Affirmed.